Our next case for today is 2018-1300, ABB v. United States. Mr. Bond, please proceed when you're ready. Mr. Bond, before you get into your argument, I just have what I guess I'd call a housekeeping question. Your brief is marked confidential. I don't see that marking on the government brief or the ABB brief. Can we assume that there's nothing confidential here so that we can have a free discussion? Yes, Your Honor. And can we also assume that, for purposes of any opinion that may be written, that there's nothing in here that we need to be concerned about in terms of confidentiality? It's always an inhibiting factor when you see this, and yet often you come to oral argument and there's nothing really confidential. This is just sort of a holdover from the lower court. Right. I understand. I mean, there could be certain elements of data in the appendix that would still be considered confidential with respect to specific commissions or expenses that were incurred. Well, your entire brief is marked confidential, and I don't see any designation within the brief of particular things that are the reason that things are confidential. Hey, Mr. Kindler, speak. Yeah, go ahead. Thank you, Your Honor. If you look at the certificate of compliance, the brief itself contains no confidential information. However, the addendum contains confidential information, which is why we as counsel as a precaution mark the brief in its entirety confidential. So nothing in the brief is confidential. So anything that's in the brief is fair game. That's correct, Your Honor. So for purposes of the two issues before us, the failure to exhaust issue and the commission offset issue, we don't need to worry about confidentiality. Insofar as it's discussed in the brief, that's correct, Your Honor. Okay. Thank you. You're welcome. Again, no time was taken off. No, it's fine. I just wanted to get that straight out at the start. Understood. Thank you. Good morning. May it please the Court, my name is David Bond. I'm a partner with White & Case, and I'm appearing this morning on behalf of Hyundai Heavy Industries. Our appeal presents two issues. The first is whether the circumstances presented before the CIT presented a strong contrary reason for the CIT to overlook the statutory language which directs it to require exhaustion. It's important, we think, to understand from the outset that the question here is whether an extraordinary circumstance existed that warranted not requiring exhaustion. Both the Department of Commerce and the CIT were of the view that ABB did not, in fact, exhaust. So the question is whether there's something extraordinary that justifies the failure to exhaust. Well, let me ask you, I guess it's Appendix 116, excuse me, through 118, which is the Commerce remand determination. At those pages, it seems to me that Commerce lays out a little bit of a history of what happened in the case. And it seems to me that it makes a pretty good showing that in the final decision and in the amendments to the final decision that there was some confusion and back and forth. And it kind of struck me that under those circumstances, the CIT did not abuse its discretion in saying, I'm going to send it back for Commerce to take another look. It seemed to me that it was not inappropriate, which I think is appropriate is the word in the statute. It was not inappropriate for the CIT to do that given what's spelled out and no one disputes at those pages. I think I would direct the Court to page 6 of our reply brief where we discussed the actual complaint that ABB raised initially before the CIT. The specific programming language with respect to the treatment of commissions and the commission offset, which is exactly precisely the same language which was presented in the preliminary results. There is no difference whatsoever in the way that the Commerce Department treated U.S. commissions in its second amended final results compared to the preliminary results. And there's no difference in the way it treated the commission offsets. And therefore, in the evolution from the preliminary results to the second amended results, there were some changes in descriptions and things like this as to what was going on. But the essential claim, as it was stated, the specific programming language that was identified in the complaint was precisely the same as the programming language in the preliminary results. And that issue was not raised in any way in the case briefs that ABB submitted before the Commerce Department. Maybe the program language should have tipped ABB off. I agree with you. But I don't know that I can find there's clear error for the CIT's determination that Commerce failed to explain itself in its decision. This is abuse of discretion.  And so even if I think ABB should have been unnoticed given the computer programming results, I don't know that I can – I don't know that that's inconsistent with me concluding that Commerce did not clearly err, i.e. the burden I have to use, in determining that it failed to adequately express its treatment of the commission offsets. How do you respond to that? Well, I would respond, I think, by pointing the court to Boomerang and Boomerang Tube where the court – this court very clearly placed the burden on the litigants there to have anticipated potential issues that could have been raised and then didn't excuse them. Yeah, but in individual cases you can do that. But here I'm not – I have the burden of reviewing Commerce's determination that it didn't sufficiently explain itself for clear error. How do I get around that? It did seem, Mr. Bond, that Boomerang Tube, which you rely on and correctly describe in your brief, involved a different set of facts and the question of whether the CIT abused its discretion is highly sort of fact-bound or fact-specific. And you didn't have in Boomerang Tube what you seem to have here, Commerce diverging from its normal practice and not giving an adequate explanation for that, which was the basis for the CIT remand in ABB 1, I think. Well, at the time that the preliminary results were issued, the programming language was the way the Commerce Department was approaching the issue. It's the way it approached it in previous proceedings. We, as well as our colleagues that represent ABB, have experts on staff that are familiar with the Commerce Department's programming language. We're able to interpret what the Commerce Department was doing, and yet there's no mention of this in their case brief. It seems to me odd that we would excuse them from the obligation to have raised timely the issues with respect to the preliminary results in their case brief based on things that transpired long after in the amended results based on theoretical clerical errors in the Commerce Department's program. At the point in time when ABB was required to exhaust its remedy by raising issues that it thought were relevant in its case brief, it had the programs in front of it. The programs clearly identified the error, which it later raised at the CIT. So while things that happened after the preliminary results in the case briefs were filed may have added further points for discussion in that appeal, the core issue, which was whether the Commerce Department was correctly accounting for the commissions and the offsets, was perfectly clear in the preliminary results. Well, let me, if I could, just switching from the abuse of discretion issue to the merits. 19 U.S.C. I always have to go on a little bit of a trail here under the statute. 1677 B.A.C. 6.3 calls for adjustment to normal value based upon, quote, other differences in the circumstances of sale. And I understand the argument that you're making about the commission offsets here, but my question is, was there, what if any, apart from your argument about commission offsets, what if any adjustments were made in this case under the circumstances of sale provision? Well, there are a variety of factors that relate to selling expenses in particular that are accounted for through a circumstance of sale adjustment. For example, warranty claims would be one. There are adjustments made with respect to differences in the credit period in each market, the credit period being the time. Were those what you're describing made in this case? Yes. Okay. What, in other words, what circumstances of sale adjustment were made in this case? And if you don't want to use time rattling them off, you can direct us to where in the record it's shown that they were made. Do you have the programming language? We'll research that. I'll provide the information during my rebuttal time if that's okay. That's fine with me. The basic point, however, is that various circumstances of sale adjustments are made typically and were made in this case for concepts aside from the commission issue. In our view, the commission issue really boils down to one of fairness and accuracy. It's quite clear that the statute directs that prices for exports to the United States and prices that are being used for normal value be adjusted to an ex-factory basis, a net price, and that in doing so, in order to arrive at a fair calculation, there has to be a symmetric adjustment or allowance to each side to account for the same sorts of expenses. So with respect to commissions in particular, where commissions are incurred both with respect to U.S. sales and sales in the domestic market, you see that the commissions are being deducted. There's an allowance being made for those on each side of the equation to result in a symmetric calculation. And you primarily rely, I guess, for your argument on the regulation, right? 3-5-1-0-E. We take the next step, Your Honor, which is that the Commerce Department has correctly recognized that really a commission is accounting for a selling function. It's accounting for the effort, the expense that a company makes to sell the product. And so in a circumstance where you have commissions being paid with respect to one market but not the other, it's appropriate to arrive at a symmetric comparison to account for the selling expenses in the market where commissions aren't being paid. You offset the commissions in one market with the selling expenses being made in the other market to sort of equally account for the selling function that's being performed, which is why if you look at the regulation, the only condition that the regulation speaks to is that the Commerce Department has made a reasonable allowance for commissions in one of the markets and no commission is paid in the other market. There's absolutely no further condition imposed, particularly the condition that the Commerce Department imposed here, that the condition must have been paid or incurred in the foreign market with respect to the U.S. sales. Our view is that the statute speaks clearly to fairness and symmetry in terms of the calculations and the allowances that are made on each side of the equation. The regulation itself, with respect to the commission offset, correctly seeks that sort of symmetry and balance by requiring an offset for expenses in one market where commissions are being deducted in the other market. But here, for whatever reason, the Commerce Department has interpreted that unreasonably and only one circumstance not to apply, and that circumstance is where the commissions paid with respect to U.S. sales are incurred in the United States as opposed to outside the United States. Ultimately, the result is that in every single dumping calculation of this particular sort, whereas the CEP transaction, which means that the U.S. sale is made through an affiliated reseller, where the commissions are incurred in the United States, will artificially have the dumping margin increase substantially. In our case, just with respect to this one review, it's over a million dollars, and over the course of multiple reviews, it will be many, many millions of dollars. In our view, it's unreasonable. There's nothing in the statute that results or directs the Commerce Department to make this sort of asymmetric adjustment. There are places in the statute where commerce is specifically directed to make asymmetric adjustments. In particular, with respect to profits that are incurred on affiliated resales, the statute requires the department to make these sorts of asymmetric adjustments, but that's not the case with respect to the circumstance of sale adjustment, and the regulation on the face doesn't impose. I just want to make sure I understand the interpretation and issue here. We have to give deference to an agency's interpretation of its own regulation in this circumstance. Is there any evidence, and if there is, I'm sorry, I've missed it. Is there any evidence that commerce is acting inconsistently, that in other instances, apart from your evidence of what happens abroad versus at home, which I understand, but is there any other evidence where in other sorts of cases like this, other duty orders or implementation, that they are treating this scenario differently? Well, I would say the most direct evidence is the discussion in our case brief with respect to the commission offset and the six scenarios that we've described. And essentially, you get to six different scenarios because you have situations in the U.S. where you have EP and CEP sales, which is— Are those on your part, or are those the actual— No, they're actual, and we provide citations. So in five out of the six scenarios, what you see is that where a commission is incurred in one market but not the other, a commission offset is made to create the sort of symmetry that I'm describing. In only one circumstance, which we described as scenario six, there's a commission offset denied, and it's denied on the basis that the commissions in the U.S. were incurred in the U.S., which is why I'm saying it's not— But each of those is a different scenario than the commissions being incurred in the U.S. The six that you're—you're trying to show me how, based on those, that there seem to be asymmetric results with no reasonable explanation for why they're asymmetric, but that wasn't exactly the question I was trying to get at. I was trying to get at is there any inconsistent behavior by commerce vis-à-vis this exact— Specific issue. Yeah. I think one case before that, the Commerce Department had granted commission offsets under these circumstances. About a year or so before our case, they decided to stop doing that without any particular explanation and certainly no change in the regulation or the law that would have warranted it. So prior in time, yes, there are inconsistent treatments of the same issue, but currently the approach the Commerce Department has taken is what they're consistently doing. Mr. Bond, in what case did—you just said they changed—switched gears, if you will, in a case? The Commerce Department points to a PASTA case, which we cite in our— Which case is that? PASTA. PASTA. Oh, the PASTA case. Something around PASTA. Well, there were two iterations of that, one at 64 Federal Register and then one other one at 80, I think. You're talking about the second one? More recent PASTA case? I believe so, yes, Your Honor. Okay. I thought you were probably talking about the PASTA case, but I just wasn't sure. Okay. Yes, we're citing to—well, we say until recently on page 25 of our case brief, citing to PASTA Federal Register notice in 1999 that those sorts of commission offsets were, in fact, made. Unless you have further questions, I'll reserve my remaining time. We'll restore your two minutes, Mr. Bond. Is it TOTA? TOTA. Okay. Thank you, and may it please the Court. As the Court noted, there are two issues raised by the appellants in the case. First is with respect to exhaustion of administrative remedies, for which we are taking no position on appeal. The second is the question of the commission offsets. With respect to the commission offsets, Commerce's determination, as expressed in the remand results, was a reasonable interpretation of the statute and its own regulations. And the starting point for that is the distinction between U.S. price and normal value. TOTA, let me ask you, and I'm sorry for jumping in in the middle of your sentence there, but as you know, time is fleeting in the oral argument setting, and here's my question. One question I have, please. At Appendix 108, we have the remand determination by Commerce, okay? And down at the bottom of 108, Commerce is referring to a situation where commission is paid outside the United States. And it says, Commerce in this situation, Commerce adds U.S. commissions incurred outside the United States to normal value of the respective home market sales and then grants home market commission offsets, if applicable, to normal value of such home market sales. Could you just explain, give me an example and explain exactly how that's working? Okay, so our understanding I understand what you're saying, but I want to have a clear picture in my mind of exactly what happens there. Give me a concrete example. Okay, so we have a situation where you have a U.S. sale where there's a commission incurred outside the United States. Commerce puts that in the field they call U.S. com. Then they're comparing that to the normal value, so that's the sale they sell it for in their home market. The sale of the same product in the home market. Right, same product in the home market. These big pieces of equipment. Yes, these power transformers. So you're comparing what they sell it for in the home market to what they sell the same product for in the U.S. That's the goal of the fair comparison under the statute. If you have a commission incurred in the home market for normal value on a sale to a customer in the home market, the way the commission offset's going to work, you're going to compare the commission they're getting when they sell it to someone in the home market to the commission when they sell it to a U.S. customer. In other words, the commission they pay in the home market for the sale to a Korean entity. Yes. Right? So that gets factored in. It's added to the normal value in the home market, right? Right. And then what's the next step where there's this offset based on the outside U.S. So you have a commission incurred outside the United States for a sale to a U.S. customer. If the commission on the sale to the U.S. customer is less than the commission that they pay for the sales in the home market, that's an offset, but that makes the normal value go higher, which in essence would mean that there would be more of a dumping margin. If the commission for the U.S. sale is higher than the commission they're paying on the home market sales, then there's, again, the home market commission offset, but that makes the normal value go lower, which mathematically would mean that the dumping margin would be less. When you say the offset, what happens, say the commission in Korea in the home market is $100,000. Okay. And that has now increased the normal value, correct? Yeah. Now, say the commission paid for the CEP sale paid outside the United States is $50,000. What happens? How does it exactly get factored into this normal value? All right. So in that case, you're saying that the commission on the U.S. sale incurred outside the United States is less than the home market commission? Yes. Under that situation, there would be a home market commission offset, but it would increase the normal value. Why would it increase the normal value? Because, again, you're basically comparing. You're trying to make the circumstances of sale adjustment under 1677B, so you're trying to get as accurate a comparison between what sales are like in the home market, what sales are like in the U.S. market. And this is how commerce is approaching that mathematically. And there would be a formula that would factor in that $50,000 difference. Right. And they express that through their programming language. Now, the difference when you have the commission incurred in the U.S. market is you're not doing it on the normal value side. You're doing it on the U.S. side. And that's actually directed by statute in 1677B that you deduct the commissions. So commerce does not change around the amount of adjustment in the normal market, in the home market, which is on the normal value side, because it's not making an adjustment based on economic activities occurring in the home market. If the economic activities are occurring in the United States, commerce made the decision that you don't then go back and adjust the amount of commission in the home market. You're just doing it in your adjustment of U.S. price based upon their reading of the statute, based upon their reading of the Statement of Administrative Action, which talks about economic activities occurring in the United States. Now, do you agree with Mr. Bond that there were in this case certain circumstances of sale adjustment that were made? Yes, and we would direct the court to the remand. The initial final results would go through probably the bulk of those, and there's also an issue and decision memorandum associated with those. Also, the second amended final results. Do you have specific pages in the appendix for that? I don't have the sites for the pages. Because then if we wanted to see what adjustments were made to normal value under the circumstances of sale provision in the statute and the attendant regulation, we would go to what again? I just want to change. I would look at the final results and then the first and second amended final results, and then also the issues and decision memorandum for the final results would be the place I would direct the court, and also on the remand. In this court, this actually is a circumstance of sale adjustment, or at least one being discussed. So, again, the remand results from the court case, which the court has asked us about during the oral argument, would be another place to look. But in terms of other ones other than commission offsets, those would be the places I would direct the court. Hyundai's argument that the statutes don't express a geographic distinction. Yes, they don't express a geographic distinction, but Commerce's interpretation was reasonable, and the trial court's determination that Commerce's determination was correct for the reasons stated there. First, the Statement of Administrative Action speaks very explicitly to economic activities occurring in the United States, and the trial court cited that language as well as the preamble to the anti-dumping rules. Also in the section of the Statement of Administrative Action dealing with normal value, page 828, as the trial court cites, there is an explicit reference to first economic activities, but also the concerns underlying the statute of avoiding double counting and possible overlap. Commerce is employing this technique, only applying the offset when the commissions are incurred outside the United States, that was a reasonable interpretation of the statute in light of those provisions. Hyundai also talks about 351.410 subsection E, saying, well, it talks about commissions incurred in one market, not the other. It doesn't say in what market, so then you must have to do the same thing everywhere. Again, that's not supported first. That regulation was promulgated pursuant to the normal value statute, so it's not under the U.S. price statute. Also, the situation you're talking about here, a comar commission offset, there are commissions in both markets. It's just how commerce chooses to analyze those in order to reach a fair comparison. Commerce's determination based upon that analysis was reasonable. As the trial court also noted, the economic activities analysis, that's the kind of thing we have commerce is charged with analyzing, is whether where the economic activities are occurring, how you determine the effect of that and how that's expressed in commerce's programming language. That's an expressly methodological decision. That is something that commerce is charged with doing. Hyundai has not shown that commerce's analysis was unreasonable or contrary to the precise language of the statute, such that commerce's decision was in violation either of Chevron step one or Chevron step two. And for those reasons, if the court concludes that it should reach the issue of commission offset, then we respectfully request that the court affirm the decision of the Court of International Trade with respect to that issue.  Thank you. May it please the Court, Alan Liberda on behalf of Plaintiff Appellee's ABB from the law firm Kelly Dry and Warren. To go straight to the denial of the commission offset, we have to start with the statutory language for the circumstances sale that Hyundai is seeking. The language in 1677B6C says, make a circumstances sale by increasing or decreasing any difference between export price or constructed price and the normal value price described in 1B of this section. So the CEP, the constructed export price, is calculated by deducting commissions incurred in the U.S. first. So the CEP that's being compared to normal value no longer has those commissions in it. Since there are no commissions still included in the constructed export price, there's no basis on which to make a circumstances sale adjustment in that instance. There were no home market commissions to balance it against. It's already taken out of CEP because that's what we're saying. It's agreed there were no home market commissions in this particular case. That's correct. That's correct, Your Honor. So in calculating CEP in 1677A-D1, commissions are deducted out of the starting price, the U.S. starting price, to get your CEP. It's no longer there to make a circumstances sale adjustment against in the statute. The regulation that the Commerce Department is reasonably interpreting gets its authority from 1677B. It cannot grant a right that the statute didn't give it, which is there must be something in the U.S. price against which to offset. And it's not there anymore based on the plain language of the statute. And then, of course, the Statement of Administrative Action draws that distinction too. The Statement of Administrative Action for the URAA when the changes were made to Statute 1996 explicitly talks about distinguishing in the CEP context the economic expenses that are related to economic activity in the United States versus those that are not. Where you have expenses not related to economic activity in the United States, you go to the circumstances sale adjustment because you won't have already deducted those in the calculation of CEP. Mr. Lieber, just one question. What was in the case here? We know we had CEP commissions paid in the U.S., correct? That's correct. And you said there were none paid outside. There were none paid in the home market period. Just as a hypothetical, what would have been the situation here if there had also been CEP commissions paid outside the United States as well as those paid inside the United States? What would have happened in that case? The CEP commissions or other CEP expenses that were paid outside the United States would be subject to a circumstance of sale adjustment. The way Mr. Toto was describing for us. Yes. They're offsetting for the difference in selling expenses. What Mr. Bond has been arguing is that since there are no home market commissions, there were other indirect selling expenses in the home market that should be adjusted for. But he's already getting in the CEP offset, which is a separate offset, he's already getting an adjustment for those CEP selling expenses. The indirects in the United States come out of CEP and the indirects in the home market. And that's specifically provided for in the statute. So he's getting all the symmetry he needs. Okay. Thank you very much. Mr. Bond, you have some rebuttals. Thank you, Your Honors. Thank you. I'd like to focus on the commission issue with my remaining two minutes. Just two comments. First, I think it's very important to focus on the fact that there are two separate issues involved here. The first is the treatment of commissions paid on U.S. sales under the statute. And the statute makes a distinction as to how that adjustment is made based on whether the commission is incurred in the United States or incurred outside of the United States. So the entire discussion that we've just heard about whether you deduct it from the CEP, the U.S. price, or you make a circumstance of sale adjustment relates to the proper accounting of the commission paid on the U.S. sale. It tells you absolutely nothing about whether a commission offset should be made with respect to that U.S. commission. Our point is that a commission offset should be made regardless of whether the U.S. commission is incurred inside or outside the United States. As Mr. Libera just described, it's perfectly clear that with respect to a CEP sale, where a commission is paid on that U.S. sale and it's incurred outside the United States, a commission offset is made for the selling expenses incurred on the domestic sale in the domestic market. But inexplicably, the Commerce Department has decided that that very same adjustment won't be made simply in cases where the commission is incurred inside the United States with respect to the very same sale. This distinction as to whether the check is written in Korea for the commission versus the United States is distinguishing whether a commission offset is made for selling expenses incurred in the United States. It's a completely arbitrary distinction, particularly in light of the Commerce Department's logic that an offset is required in any case. It's appropriate in any case where commissions are incurred with respect to sales in one market but not the other. I would point the Court to the six scenarios that we developed in our case brief for further discussion of this point. Thank you. Thank you, Counsel. The case is taken under submission. All rise. I now call the Court of Subjects. 5-1 at 10 a.m.